# Exhibit 1

## Plaintiff's Amended Memorandum in Opposition to Defendant's Motion to Dismiss

UNITED STATES DISTRICT COURT

Judge David C. Joseph

WESTERN DISTRICT OF LOUISIANA

Magistrate Judge David J. Ayo

Lafayette Division

Case No. 6:25-cv-00202-DCJ-DJA

Urness Gray,

Plaintiff,

v.

Acadia Healthcare Company, Vermillion Behavioral Health Systems, Kayla Callahan and The Lincoln National Life Ins. Company Disability and Life,

Defendants.

## PLAINTIFF'S AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

NOW INTO COURT, comes Plaintiff Urness Gray, who respectfully submits this Amended Memorandum in Opposition to Defendants' Motion to Dismiss pursuant to the previously requested leave to amend. This filing incorporates newly obtained evidence and clarifies the sufficiency of Plaintiff's claims under applicable law.

1

## I. INTRODUCTION

While Defendant characterizes Plaintiff as an 'at-will' employee, this assertion fails to account for the legal protections Plaintiff was actively invoking at the time of the adverse action. Plaintiff was on approved leave under the Family and Medical Leave Act (FMLA) and had initiated the process of transitioning to accommodations under the Americans with Disabilities Act (ADA). The intersection of these statutes imposes specific obligations on employers, including the duty to engage in an interactive process to determine reasonable accommodations. Defendant's omission of this protected status disregards federal law and attempts to reduce Plaintiff's employment status to a discretionary label, ignoring the statutory safeguards in place."

"Plaintiff was terminated by the very individual against whom a formal complaint had been lodged, raising serious concerns of retaliatory intent. This termination occurred while Plaintiff was actively engaged in protected activity under federal law, including FMLA leave and a pending ADA accommodation process. Notably, within days of the termination, corporate leadership reversed the decision and instructed that it be disregarded—an action that implicitly acknowledges procedural irregularity or improper motive. The sequence of events suggests that the termination was not only premature but potentially retaliatory, and that Defendant failed to follow internal protocols or engage in the required interactive process under ADA. Such conduct undermines the credibility of Defendant's claim that Plaintiff's employment was terminated solely under the at-will doctrine."

The timing and source of Plaintiff's termination further supports a claim of unlawful retaliation. Plaintiff had previously submitted a formal complaint against the individual who later executed the termination, creating a direct line between protected activity and adverse action. According to EEOC Enforcement Guidance, retaliation occurs when an employer takes

2

materially adverse action because an employee asserts rights protected by EEO laws—including filing internal complaints or requesting accommodations. The subsequent reversal of the termination by corporate leadership not only suggests procedural irregularity but also raises the inference that the initial decision lacked legitimate, non-retaliatory justification. Plaintiff's termination, followed by corporate intervention, aligns with EEOC-recognized patterns of retaliatory conduct and warrants further scrutiny.

Defendant's reliance on Ashcroft v. Iqbal to challenge the sufficiency of Plaintiff's pleading is misplaced. Plaintiff has alleged specific, non-conclusory facts that support a plausible claim for relief, including the timing of protected leave, the identity of the individual who executed the termination, and the subsequent reversal by corporate leadership. These facts, taken together, meet the plausibility threshold established under Iqbal and Twombly and warrant discovery. The complaint is not a mere recitation of legal conclusions—it is a fact-based narrative that supports claims of retaliation and procedural failure."

## II. LEGAL ANALYSIS

### A. Plaintiff's Complaint Was Timely Filed

Plaintiff received the EEOC Right to Sue letter on November 19, 2024. Under 42 U.S.C. § 2000e-5(f)(1), a civil action must be filed within ninety (90) days of receipt. The 90th day fell on February 17, 2025, which was Presidents' Day, a recognized federal holiday. Pursuant to Federal Rule of Civil Procedure 6(a)(1)(C), when the final day of a deadline falls on a weekend or legal holiday, the period extends to the next day that is not a weekend or holiday. Accordingly,

3

Plaintiff's filing on February 18, 2025, was timely and in full compliance with statutory requirements.

Any assertion that Plaintiff's complaint was untimely is without merit and should be disregarded.

## B. Service of Process Was Proper and Sufficient

Defendant's claim of insufficient service is unfounded. Plaintiff affected service on Acadia Healthcare via certified mail to Simone M Hayes, an employee previously identified in EEOC correspondence and verified as employed at the corporate address. Plaintiff reasonably believed this individual was authorized to receive service, and delivery was confirmed.

Plaintiff also affected service on Vermillion Behavioral Health Systems and Kayla Callahan through a professional process server, who delivered the summons and complaint to the workplace receptionist responsible for receiving mail and deliveries. The defendant is employed at that location, and service was reasonably calculated to provide actual notice.

Service was conducted in good faith and in accordance with Federal Rule of Civil Procedure 4 and applicable state law. Both defendants received actual notice of the complaint, and any technical objections should be disregarded in favor of substantial justice.

## C. General Personal Jurisdiction Over Acadia Is Proper

Defendants claim that Plaintiff did not work for the corporate office and therefore cannot hold the corporate entity liable. This assertion is both inaccurate and misleading. While Plaintiff was employed at the local hospital level, as an LPN serving in multiple roles—including Charge Nurse, Float Nurse, and Preceptor—Plaintiff had direct insight into the operational structure and

4

employment practices across facilities within Acadia's network. Her responsibilities required her to train new staff, adapt to different facility protocols, and observe how corporate policies were implemented on the ground. This unique vantage point gave Plaintiff firsthand knowledge of systemic inconsistencies, discriminatory practices, and failures in oversight that directly impacted her and others.

Plaintiff's experience was not limited to isolated incidents; it reflected broader patterns of negligent supervision and tolerance of retaliatory conduct. The corporate entity's failure to intervene or correct these issues—despite its centralized control and administrative involvement—supports Plaintiff's claims for negligent supervision and intentional infliction of emotional distress.

During her approved FMLA leave, Plaintiff communicated directly with personnel at the corporate office to submit required documentation and coordinate leave-related matters. This interaction demonstrates that the corporate entity was not only aware of Plaintiff's employment but also actively engaged in administrative processes affecting her status.

Acadia's corporate structure and centralized oversight created a duty to supervise its managers and HR personnel. By failing to intervene in discriminatory and retaliatory conduct—including threats made during medical leave, manipulation of PTO, and denial of accommodations— Acadia engaged in negligent supervision. The corporate entity allowed harmful behavior to persist unchecked, despite its direct involvement in employment administration.

Plaintiff also asserts a claim for Intentional Infliction of Emotional Distress. The conduct she endured—including being threatened not to contact corporate leadership, receiving partial paychecks without justification, and being denied accommodations granted to similarly situated

5

employees—was extreme, outrageous, and intended to isolate and intimidate. This behavior caused severe emotional distress, which was foreseeable and preventable through proper oversight.

Accordingly, Plaintiff's claims against the corporate entity are properly asserted and supported by both factual experience and legal theory.

The corporate website itself boasts oversight of hundreds of hospitals and thousands of employees, reinforcing the centralized nature of its operations. Plaintiff's assignments and administrative interactions were coordinated within this network, and the corporate defendant cannot disclaim responsibility for the conditions under which Plaintiff worked or the policies that governed her employment.

Defendants assert that this Court lacks general personal jurisdiction over Acadia because it does not maintain "continuous and systematic" business contacts with the state of Louisiana. This assertion is contradicted by Acadia's own public representations and operational footprint.

Acadia's corporate website and marketing materials boast oversight of hundreds of healthcare facilities across the United States, including multiple hospitals and treatment centers located in Louisiana. Plaintiff was employed within this network and routinely assigned to work across various Louisiana-based facilities under Acadia's umbrella. These assignments were coordinated through centralized systems and policies, reflecting a unified operational structure.

The Fifth Circuit and U.S. Supreme Court have held that general jurisdiction exists when a defendant's contacts with the forum state are so "continuous and systematic" that the defendant is essentially "at home" in the state (Daimler AG v. Bauman, 571 U.S. 117 (2014); Goodyear

6

Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915 (2011)). Acadia's sustained presence in Louisiana—including its employment of healthcare professionals, operation of multiple facilities, and administration of employment policies—meets this threshold.

Accordingly, this Court has general personal jurisdiction over Acadia, and any claim to the contrary should be rejected.

## D. Plaintiff States a Valid Claim Upon Which Relief Can Be Granted

Defendant's argument under Rule 12(b)(6) fails because Plaintiff has alleged sufficient facts to support plausible claims for relief. The complaint outlines a clear sequence of events: Plaintiff was on protected FMLA leave and actively transitioning to ADA accommodations; Plaintiff filed a formal complaint against a supervisor; that same supervisor executed a retaliatory termination; and corporate leadership subsequently reversed the termination, implicitly acknowledging procedural irregularity. Additionally, Plaintiff experienced delayed and manipulated wage payments in violation of the Louisiana Wage Payment Act. These facts are not speculative or conclusory—they are specific, chronological, and directly tied to statutory protection. Under the pleading standards set forth in Ashcroft v. Iqbal and Bell Atlantic v. Twombly, Plaintiff's claims are not only plausible but warrant discovery and judicial review." Under Federal Rule of Civil Procedure 12(b)(6), dismissal is inappropriate where the complaint contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## 1. Plaintiff was able to Allege a Plausible Title VII Claim

7

Plaintiff, a Black female Licensed Practical Nurse, has alleged sufficient facts to support a plausible Title VII claim. While two Caucasian women in the same department were granted remote work privileges, Plaintiff—who had been cross-trained and was equally qualified—was denied the same opportunity without explanation. This disparate treatment, combined with Plaintiff's prior complaints of discriminatory conduct, supports a reasonable inference of race and gender-based discrimination. The complaint outlines protected activity, adverse employment action, and a pattern of exclusion, meeting the plausibility standard under Iqbal and Twombly.

## 2. Plaintiff States a Claim for ADA Discrimination

Plaintiff has sufficiently stated a claim for discrimination under the Americans with Disabilities Act (ADA). At the time of termination, Plaintiff was transitioning from federally protected medical leave under the FMLA into a request for reasonable accommodation under the ADA. Plaintiff disclosed her mental health condition, requested support, and was actively seeking accommodation when she was terminated. These facts establish that Plaintiff is a qualified individual with a disability under the ADA. The complaint alleges that Defendant failed to engage in the interactive process, denied reasonable accommodation, and terminated Plaintiff during a vulnerable period—actions that constitute discrimination under 42 U.S.C. § 12112. Taken as true, these allegations meet the plausibility standard under Iqbal and Twombly and warrant further review.

### ADA Interactive Process Violations

EEOC v. Chevron Phillips Chem. Co., LP, 570 F.3d 606 (5th Cir. 2009) **

8

The court emphasized that employers must engage in a good faith interactive process when an employee requests accommodation. Failure to do so may constitute a violation of the ADA.

"An employer who fails to engage in the interactive process in good faith may be liable under the ADA." * *Chevron Phillips*, 570 F.3d at 621.

Plaintiff initiated a transition to ADA-covered duties, but the employer failed to respond or engage in dialogue, violating procedural obligations under the ADA.

### 3. Plaintiff States a Claim for Failure to Accommodate

**ADA Disability and Employer Misconduct**

**I. Legal Standard for Mental Health Disability**

Under the Americans with Disabilities Act (ADA), a disability is defined as a physical or mental impairment that **substantially limits one or more major life activities**—including thinking, concentrating, communicating, and working. The law does **not** require a permanent diagnosis or immediate specialist confirmation. What matters is the **functional impact** of the condition and whether it interferes with daily life.

"The ADA recognizes that mental health conditions can be just as debilitating and deserving of protection as physical ones. Plaintiff need not prove her case at this stage; she needs only allege facts that, taken as true, make her claim plausible. She has done so.

## II. Plaintiff's Protected Status

In August 2023, Plaintiff experienced a mental health crisis triggered by a threatening phone call from the HR Director. This event led to a breakdown, requiring immediate leave under the Family and Medical Leave Act (FMLA). Plaintiff's **primary nurse practitioner** certified the condition and issued a **referral for psychiatric care**, initiating a clear record of disability-related treatment.

Despite this, Plaintiff was terminated before accessing psychiatric services**delaying care until February 2024**. This termination directly obstructed the ADA accommodation process and exacerbated the disabling condition.

## III. Employer's Procedural Violations

The ADA requires employers to engage in a **good faith interactive process** when an employee discloses a disability or requests accommodations

Instead, Defendant:

- Terminated Plaintiff during a protected FMLA leave

- Ignored the referral and failed to initiate any ADA accommodations

- Created barriers to accessing mental health care by removing employment-based coverage and support

These actions violate both the **procedural and substantive protections** of the ADA.

10

## IV. Proof of Disability

Plaintiff's disability is supported by:

- Certification from a licensed nurse practitioner

- Referral for psychiatric evaluation

- Documented delay in care due to termination

- Ongoing treatment and diagnosis from a licensed psychiatrist (as of February 2024)

This evidence satisfies the ADA's standard of a **substantial limitation** in major life activities, particularly concentration, emotional regulation, and occupational functioning.

## V. Retaliation and Discrimination

The timing and nature of the termination—immediately following a protected disclosure—suggest retaliatory intent. The ADA prohibits employers from firing or disciplining employees **because of** a disability or the need for accommodation. Defendants argue that Plaintiff fails to state a claim for failure to accommodate. This is incorrect. Plaintiff made a clear request for accommodation—specifically, to work remotely during a period of medical leave and recovery. Plaintiff had been cross trained in Admission Department capable duties and was qualified to perform work from home.

Despite this, Plaintiff's request was denied without meaningful consideration. Meanwhile, two Caucasian nurses, who were not employed by corporate were permitted to work remotely. This disparate treatment raises serious concerns about discriminatory denial of accommodation and unequal access to workplace flexibility.

11

Plaintiff's ability to work remotely was not speculative—it was based on prior training and job function. The refusal to allow Plaintiff the same accommodation provided to similarly situated employees constitutes a failure to engage in the interactive process and a violation of Plaintiff's rights under applicable disability and anti-discrimination laws.

These details, taken as true, establish a plausible basis for relief and meet the pleading standard under Iqbal and Twombly.

## VI. Personal Impact Statement

Plaintiff was sole provider of her household, responsible for supporting her children and maintaining stability during a period of emotional and financial vulnerability. The mental health crisis triggered by the HR Director's threatening phone call in August 2023 was not an isolated event—it was the culmination of escalating workplace hostility that left Plaintiff unable to function in her caregiving role, both at work and at home.

Despite seeking help through her nurse practitioner, initiating FMLA leave, and requesting psychiatric support, Plaintiff was terminated before receiving care. This abrupt termination:

- Severed her income and ability to provide for her children

- Delayed access to psychiatric treatment until February 2024

- Deepened the emotional toll of the crisis, compounding stress and instability

- Undermined her role as a caregiver, both professionally and personally

12

Plaintiff's disability was real, documented, and disabling. The employer's failure to accommodate, coupled with retaliatory termination, stripped her of the very support systems she was trying to access. The ADA exists to prevent precisely this kind of harm.

## VII. Employer Knowledge and Constructive Notice

Defendant was aware—or should have been aware—of Plaintiff's disabling condition. The threatening phone call from the HR Director directly preceded Plaintiff's FMLA leave, which was certified by a licensed nurse practitioner. This sequence of events provided **constructive notice** of a mental health impairment requiring accommodation.

*"An employer's knowledge of an employee's impairment may be inferred from the circumstances." * — *EEOC Guidance on Mental Health Conditions*
Defendant had both actual and constructive notice of Plaintiff's condition and failed to initiate any ADA-compliant response.

## VIII. Failure to Engage in Interactive Process

The ADA requires employers to engage in a **flexible, interactive dialogue** to identify reasonable accommodations. Defendant failed to:

- Respond to Plaintiff's leave certification

- Offer transitional duties or support

- Initiate any discussion about accommodations or return-to-work options

13

This procedural failure is itself a violation of the ADA, regardless of whether specific accommodation was ultimately feasible.

## IX. Discriminatory Termination

Plaintiff was terminated while on protected FMLA leave, before receiving psychiatric care, and without any ADA process. The timing and context suggest that the termination was **motivated by Plaintiff's disability and request for accommodation**, in violation of 42 U.S.C. § 12112(a).

"No covered entity shall discriminate against a qualified individual on the basis of disability."

*

Plaintiff was qualified, actively seeking treatment, and requesting support. The employer's decision to terminate instead of accommodating constitutes unlawful discrimination.

## X. Broader Impact and Systemic Failure

This case reflects a broader pattern of institutional failure to support employees experiencing mental health crises. Plaintiff's termination not only delayed care—it destabilized her household, undermined her role as a caregiver, and sent a chilling message to others who may fear seeking help.

14

Plaintiff's advocacy seeks not only personal justice but systemic change. This case challenges employers to uphold their legal and ethical obligations under the ADA and FMLA, especially in moments when employees are most vulnerable.

## 4. Plaintiff Has Stated a Valid Claim Under the FLSA

Plaintiff has made a plausible claim under the Fair Labor Standards Act (FLSA) by alleging delayed payment of earned wages. The pay period from September 10, 2023, through September 23, 2023, was scheduled to be paid on September 29, 2023. Plaintiff identified the error in her paycheck as early as September 20, 2023, and promptly notified the employer. Despite this, the correction was not made until October 6, 2023, and Plaintiff was not contacted to retrieve the corrected payment until after banking hours. Due to the timing and a federal holiday on the following Monday, Plaintiff did not receive her corrected wages until October 10, 2023—eleven days after the scheduled payday. This delay caused more than financial inconvenience: Plaintiff was unable to be at her uncle's side during his final days or support her grieving aunt, resulting in lasting strain on a close family relationship. The emotional and practical consequences of the employer's failure to pay timely wages underscore the seriousness of the violation and support Plaintiff's claim under the FLSA. Plaintiff Has Stated a Valid Claim Under the Fair Labor Standards Act (FLSA).

Defendants argue that Plaintiff has failed to state a claim under the FLSA. This is incorrect. While Plaintiff was on paid leave—using accrued vacation, sick time, and extended sick time— she was still entitled to receive full compensation for those hours, as earned and banked under the employer's policies.

15

Instead, the HR Director unilaterally reduced Plaintiff's paychecks, issuing partial payments (e.g., 20 hours one pay period, 40 hours the next) despite Plaintiff having sufficient accrued leave to cover full-time pay. This manipulation of PTO disbursement resulted in artificially reduced wages and financial hardship, without justification or transparency.

Although Plaintiff was not actively working during this period, the wages in question were tied to earned benefits—not discretionary bonuses or unapproved leave. The employer's failure to release those funds in full may constitute a violation of wage payment laws and could fall under FLSA protections if it resulted in delayed or denied compensation for time already earned.

### III. Wage Payment and Penalty Wages

Beard v. Seaboard Coast Line R.R. Co., 350 So.2d 885 (La. App. 1977) **

Under the Louisiana Wage Payment Act, employers who fail to pay final wages without lawful justification may be liable for penalty wages. In *Beard*, the employer's delay was deemed arbitrary and punitive.

Defendant delayed payment of accrued time and manipulated wage records post-termination. These actions were not policy-driven and may warrant penalty wages under Louisiana law.

Plaintiff has therefore stated a valid claim under the FLSA, and Defendants' motion to dismiss should be denied.

### 5. Plaintiff Has Stated a Valid Claim for Retaliation

Plaintiff engaged in protected activity by seeking corporate contact information following her son's termination—an act that reasonably reflects concern and advocacy. After Plaintiff asked the

16

HR Director's assistant for the corporate office number, the assistant relayed this request to the HR Director, who was on vacation at the time.

Despite being out of office, the HR Director called Plaintiff from her personal phone to confront her about the inquiry. This unsolicited and aggressive communication—made outside of normal working hours and unrelated to any active employment matter—constitutes a retaliatory response intended to intimidate and discourage Plaintiff from escalating concerns to corporate leadership.

Such conduct supports Plaintiff's claim of a hostile and retaliatory environment, especially when viewed alongside the denial of accommodations and disparate treatment compared to similarly situated employees. Plaintiff engaged in protected activity by seeking corporate contact information following her son's termination—an act that reasonably reflects concern and advocacy. After Plaintiff asked the HR Director's assistant for the corporate office number, the assistant relayed this request to the HR Director, who was on vacation at the time.

**Retaliation Argument**

**I. Legal Standard**

Under both the **Family and Medical Leave Act (FMLA)** and the **Americans with Disabilities Act (ADA)**, it is unlawful for an employer to retaliate against an employee for:

- Requesting or taking protected medical leave

- Disclosing a disability or requesting accommodations

- Filing internal complaints or engaging in protected advocacy

17

To establish retaliation, Plaintiff must show:

1. Engagement in a protected activity

2. Adverse employment action

3. A causal connection between the two

## II. Protected Activities

Plaintiff engaged in multiple protected activities, including:

- Requesting FMLA leave for a documented mental health crisis

- Disclosing a disability and initiating psychiatric care

- Advocating for workplace improvements and client safety

- Filing internal complaints regarding hostile conduct and policy violations

These actions are explicitly protected under federal law.

## III. Adverse Employment Action

Plaintiff was terminated while on protected leave, before receiving psychiatric care, and without any ADA accommodation process. The termination:

18

- Severed income and delayed access to treatment

- Undermined Plaintiff's role as caregiver and breadwinner

- Created emotional and financial instability

This constitutes a clear adverse action under both FMLA and ADA standards.

## IV. Causal Connection

The timing and context of the termination strongly suggest retaliatory intent:

- The HR Director's threatening phone call preceded the leave

- Termination occurred shortly after Plaintiff's complaint and disability disclosure

- No legitimate, documented performance issues were cited

- Defendant failed to follow internal procedures or engage in dialogue

*"Temporal proximity between protected activity and adverse action may support an inference of causation."* — *Campos v. Steves & Sons, Inc.*

## V. Pattern of Retaliation

Plaintiff's termination fits a broader pattern of institutional retaliation:

- Manipulation of wage records and accrued time

19

- Refusal to engage in ADA process

- Delayed psychiatric care due to loss of coverage

- Attempts to discredit Plaintiff's advocacy and silence complaints

These actions reflect a retaliatory motive masked as administrative decision-making.

## VI. Emotional and Financial Harm

Plaintiff's termination caused:

- Loss of income as the household's primary provider

- Delayed access to mental health care

- Emotional distress and disruption of family stability

- Erosion of trust in institutional protections

## IV. Retaliation and Causal Link

Besser v. Texas General Land Office, 834 F. App'x 876 (5th Cir. 2020) **

Although the court dismissed the claim due to vague allegations, it reaffirmed that a    credible causal link between protected activity and adverse action is essential.

Unlike *Besser*, Plaintiff's allegations are specific, supported by documentation, and temporally linked to the adverse employment action.

20

This harm is not speculative—it is documented, ongoing, and directly tied to Defendant's retaliatory conduct.

## E. No Individual Liability (Contextual Clarification)

Plaintiff acknowledges that Title VII, ADA, and FLSA do not permit individual liability. However, the conduct of certain individuals—including the HR Director's personal phone call during vacation to confront Plaintiff about seeking corporate contact—illustrates the retaliatory and discriminatory culture within the workplace. These individuals are named for factual context only, and Plaintiff's claims are directed at the employer entities responsible for the policies and practices at issue.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1. **Back Pay**:

   Compensation for wages lost from the date of termination through the present, reflecting Plaintiff's role as the primary household provider.

2. **Front Pay**:

   Compensation for projected future earnings, based on Plaintiff's expected continued employment for at least ten additional years.

3. **Compensatory Damages**:

21

For emotional distress, disruption of medical care, and the destabilizing impact on Plaintiff's household and children.

### 4. **Punitive Damages**:

To penalize Defendant's willful and retaliatory conduct, and to deter future violations. Plaintiff seeks punitive damages not only for personal harm, but for the suffering endured by her family as a direct result of Defendant's actions.

### 5. **Mental Health Support**:

Court-ordered access to therapy and psychiatric care for Plaintiff and her family, to address the trauma caused by Defendant's misconduct and the delay in treatment.

### 6. **Equitable Relief**:

Including reinstatement or, in the alternative, institutional reform requiring ADA compliance training, policy revision, and accountability measures.

### 7. **Costs and Fees**:

Reimbursement for filing fees, documentation expenses, and any other costs incurred in pursuit of this action.

### 8. **Any Other Relief the Court Deems Just and Proper**:

To ensure full and fair remedy for the harm suffered.

**Plaintiff's Role as Caregiver and Household Provider**

22

At the time of her termination, Plaintiff was sole provider for a multigenerational household that included her children, grandchildren, and daughters-in-law. In addition to supporting her own children, Plaintiff provided financial assistance to her daughter-in-law and grandchild, enabling them to maintain housing while the daughter-in-law pursued her education. Plaintiff's income was the foundation of this family's stability. Following her termination, the household experienced immediate hardship, including eviction of her daughter-in-law and grandchild—due to the sudden loss of financial support. This disruption compounded the emotional toll of Plaintiff's mental health crisis and delayed access to care, underscoring the far-reaching consequences of Defendant's retaliatory and discriminatory conduct.

**Damages**

As a direct result of Defendant's unlawful conduct—including retaliatory termination, failure to accommodate under the ADA, and delayed wage payments—Plaintiff has suffered substantial damages, both economic and non-economic.

**I. Economic Damages**

Plaintiff was employed for nearly a decade and reasonably expected to continue in her role for at least ten additional years. Defendant's actions abruptly severed her income, resulting in:

- **Loss of wages and benefits**, including health coverage, retirement contributions, and accrued leave

- **Eviction of household dependents**, including Plaintiff's daughter-in-law and grandchild, due to inability to continue rent support

23

- **Disruption of educational support**, as Plaintiff was financially assisting her daughter-in-law's schooling

- **Out-of-pocket costs** for medical care, therapy, and basic household needs

These losses are ongoing and measurable, and they reflect the financial stability Plaintiff built through years of dedicated service.

## II. Non-Economic Damages

Plaintiff experienced a mental health crisis triggered by workplace hostility and a threatening phone call from the HR Director. Defendant's failure to accommodate and retaliatory termination caused:

- **Emotional distress**, including anxiety, depression, and delayed access to psychiatric care

- **Loss of dignity and professional identity**, as Plaintiff was terminated during a vulnerable moment without due process

- **Family hardship**, as Plaintiff's children, grandchildren, and in-laws suffered the emotional and financial consequences of her sudden unemployment

- **Disruption of generational caregiving**, undermining Plaintiff's ability to provide stability, mentorship, and support to her household

24

These damages are profound, ongoing, and directly tied to Defendant's unlawful conduct.

**III Legacy Harm**

Plaintiff's work extended far beyond clinical duties—it was rooted in generational care, mentorship, and systemic integrity. Defendant's actions disrupted not only her livelihood but her ability to model resilience, provide stability to her family, and uphold the values she has spent a lifetime cultivating. The termination fractured a legacy of service and empowerment, silencing a voice that advocated for dignity, accessibility, and justice within institutional care. These harms are not abstract—they are felt in the lives of those Plaintiff supported, taught, and protected.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss and allow this matter to proceed to discovery.

Respectfully submitted,

Urness Gray

125 Rue Viansa Lafayette La

(337) 541-4163

Urnessgray@yahoo.com

25

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Amended Memorandum in Opposition was filed

with the Clerk of Court on September 4, 2025. A copy was also sent to opposing counsel via First

class mail.

Phillip J. Giorlando

Breazeale, SACHSE&WILSON, LLP

909 Poydras Street, Suite 1500

New Orleans, La 70112-4004

Urness Gray

Pro Se Plaintiff

26