# Exhibit 2

## Expanded Timeline of Events

## August 2023 to September 2024

Expanded Timeline of Events (August 2023–September 2024)

Initial Incident and Retaliation

- August 18, 2023

- ~09:00: Your son calls and asks you to accompany him to Vermilion for a meeting regarding his allegations.

- 11:30: He is terminated.

- 11:36: You text the HR assistant present, expressing concern and requesting corporate's contact info.

- ~15:58: Missed call from Kayla Callahan. Upon calling back, she threatens you for reaching out to corporate.

- You text a supervisor about the threat but receive no reply until the next day.

- August 19, 2023

- You fall ill and call in for the weekend.

🩺 Medical Deterioration and Formal Complaint

- August 23, 2023

- Visit to your primary NP for elevated blood pressure.

- NP adjusts your medication and starts you on anxiety treatment.

1

- You email the Chief Nursing Officer (CNO) a formal complaint about Kayla Callahan's threatening behavior.

- August 25, 2023

- In-person meeting with the CNO regarding your complaint.

- CNO recommends taking time off to focus on your mental and physical health.

- You receive an email from Callahan indicating she contacted corporate to initiate your FMLA process.

FMLA Process and Administrative Failures

- August 28, 2023

- You begin the FMLA process.

- September 13, 2023

- NP submits FMLA paperwork, but it's incorrectly filled out.

- September 19, 2023

- Callahan emails you, pressuring you to return to work despite unresolved FMLA documentation.

- September 21, 2023

- NP resubmits corrected FMLA paperwork.

- You continue facing issues with referrals and scheduling, including delays in securing a psychologist appointment.

2

- Corporate informs you that the paperwork is still incomplete.

On October 2, 2023, Plaintiff scheduled what she believed to be a psychologist appointment, only to learn the earliest available date was December 5, 2023—well beyond the approved leave period. On October 4, 2023, corporate formally approved Plaintiff's FMLA leave, retroactively covering the period from August 19, 2023, through November 10, 2023. Despite this approval, Plaintiff remained without access to timely mental health care due to referral and scheduling failures. Meanwhile, Plaintiff's paycheck issued on September 29, 2023, was incorrect, and although a corrected check was eventually provided, it included an additional insurance deduction. From that point forward, Plaintiff's subsequent paychecks continued to reflect insurance charges, despite her being on approved leave. These actions reflect a pattern of administrative negligence and financial harm, compounding the emotional and medical distress Plaintiff was already experiencing.

Between October and December 2023, Plaintiff's employer, through administrator Kallahan, manipulated payroll disbursements by applying Plaintiff's accrued sick, extended sick, and vacation time at her discretion over five consecutive pay periods. Despite Plaintiff having prepaid insurance—evidenced by an additional deduction in October—Kallahan terminated Plaintiff on December 4, 2023, and retroactively canceled her insurance coverage. As a direct result, Plaintiff was unable to attend her scheduled psychological appointment on December 5, 2023, and was forced to reschedule for February 26, 2024, delaying essential care. Meanwhile, Plaintiff initiated the ADA accommodation process on November 15, 2023. Her primary nurse

3

practitioner submitted the required documentation on November 30, 2023, and Plaintiff received formal approval for accommodations on December 6, 2023—two days after her termination. This sequence demonstrates a pattern of administrative obstruction, retaliatory timing, and denial of federally protected rights under the ADA and FMLA.

On November 29, 2023, Plaintiff initiated a short-term disability claim after being informed by her employer that all accrued time—sick, extended sick, and vacation—had to be exhausted before filing. Plaintiff later learned this was inaccurate, and that her claim could have been initiated earlier, potentially avoiding delays in care and income. On December 28, 2023, Plaintiff spoke with Lorenzo Rivera at the corporate office for approximately ninety minutes, providing documentation of her complaints, including threats, payroll manipulation, and interference with medical leave. Despite the detailed conversation and submission of evidence, no corrective action was taken. This pattern of misinformation, delay, and inaction further supports Plaintiff's claims of retaliation, administrative obstruction, and failure to uphold federally protected rights under the ADA, FMLA, and applicable disability benefit policies.

On December 13, 2023, Plaintiff received a phone call from Lakendra Robinson of Lincoln Financial Group regarding her short-term disability claim. During the call, Robinson explained the estimated payment amount and stated that the long-term disability process was "wholly different." This verbal guidance conflicted with Lincoln Financial's published pamphlets, which suggested a more integrated or automatic transition between short-term and long-term disability benefits. The inconsistency created confusion about eligibility, timing, and procedural requirements, further complicating Plaintiff's efforts to secure necessary income replacement during a period of medical need. This contradiction underscores the lack of clarity and support provided to Plaintiff, contributing to delays and potential loss of benefits.

4

On December 19, 2023, Plaintiff received a voicemail from Lakendra Robinson of Lincoln Financial Group stating that her short-term disability benefits had been delayed due to her no longer being employed by the company. This message came more than two weeks after Plaintiff's termination on December 4, 2023, and nearly three weeks after she initiated the short-term disability claim on November 29, 2023. Plaintiff had been misinformed by her employer that she was required to exhaust all accrued leave before filing the claim—a condition not supported by Lincoln Financial's policy. The delay in processing, compounded by the employer's misinformation and abrupt termination, resulted in a loss of access to essential benefits during a period of documented medical need. This sequence further supports Plaintiff's claims of retaliation, administrative obstruction, and interference with federally protected rights.

On January 17, 2024, Plaintiff submitted an online application to the Admissions Department and inquired about the possibility of working remotely, given her upcoming medical appointment in February. Lorenzo, a supervisor, had previously granted Plaintiff additional time to attend this appointment, reflecting an acknowledgment of her medical needs. However, when Plaintiff asked about remote work, she was informed that the position she was pursuing was considered a "corporate role," and therefore not eligible for remote accommodation. The denial of remote work, despite Plaintiff's proactive efforts and medical context, further illustrates the employer's inconsistent application of policies and lack of reasonable accommodation.

On January 22, 2024, Plaintiff emailed Lorenzo Rivera to follow up on a formal complaint she had submitted on December 28, 2023, regarding her treatment by the employer. Plaintiff sought clarity on whether any investigation had been conducted or responses obtained. Rivera replied that he had "none," and acted as though no complaint had ever been made. This denial occurred

5

despite the prior documented communication and a subsequent phone call lasting approximately ninety minutes. Rivera's failure to acknowledge the complaint, coupled with the absence of any documented inquiry or resolution, reflects a systemic disregard for internal grievance procedures and further supports Plaintiff's claims of administrative obstruction, retaliation, and failure to provide a fair and transparent complaint process.

On January 23, 2024, Plaintiff's ADA accommodation case was closed due to an alleged lack of sufficient medical documentation. At the time, Plaintiff's primary nurse practitioner had provided all available support, but her scope was limited. Plaintiff was still awaiting an appointment with a mental health specialist—believed to be a psychologist—scheduled for February 26, 2024. The closure of the case prior to this evaluation denied Plaintiff the opportunity to submit comprehensive documentation and reflected a failure of the interactive process to accommodate the realities of medical access and timing. This premature closure further obstructed Plaintiff's efforts to secure reasonable accommodation and underscores the systemic barriers faced by individuals navigating disability claims.

Plaintiff later learned that her medical provider had mistakenly sent ADA documentation to the wrong office, due to confusion while simultaneously preparing disability paperwork and nursing license renewal forms. This administrative error contributed to the closure of Plaintiff's ADA case for "lack of documentation." Notably, Kayla Callahan—who had previously contacted the doctor's office on December 13, 2023, to confirm insurance status—made no effort to follow up or clarify the ADA paperwork submission, despite knowing Plaintiff was actively pursuing accommodations. Her prior outreach demonstrates that she had the means and precedent to engage with the provider, yet chose not to intervene when it mattered most. This failure to act

6

further obstructed Plaintiff's access to reasonable accommodation and contributed to the breakdown of the interactive process.

On February 1, 2024, Plaintiff received an email from Kayla Callahan stating that her ADA accommodations had expired on December 31, 2023. Despite the lapse, Plaintiff was retroactively approved for PRN employment from January 1, 2024 through February 29, 2024, with the condition that she work during that period or face termination. At the time of this notice, Plaintiff had not yet begun addressing her mental health needs, as her first psychiatric appointment was scheduled for February 26, 2024. The delayed communication and retroactive expectations placed Plaintiff in an untenable position—expected to meet work requirements without accommodations, while still awaiting medical evaluation and treatment. This undermined the interactive process and failed to account for Plaintiff's documented health challenges.

Plaintiff kept her scheduled appointment on February 26, 2024, expecting to begin therapy with a psychologist. Upon arrival, she learned the provider was actually a psychiatrist who did not offer therapy services—a critical error caused by her doctor's office misidentifying the referral. Had Plaintiff not been prematurely terminated, she would have known the nature of the referral and avoided this disruption in care. Determined to access therapy, Plaintiff independently searched for providers and secured an appointment on March 3, 2024, immediately beginning sessions. However, on March 26, 2024, the therapist's office informed her that her insurance was no longer active. Plaintiff contacted the insurance company and was told her coverage had been canceled on March 25, 2024 and retroactively backdated to December 31, 2023. As a result, Plaintiff was forced to pay out-of-pocket for all medical appointments and prescriptions from

7

January through March—an unexpected financial burden that ultimately forced her to discontinue therapy.

On September 2, 2024, Plaintiff submitted an online application through the corporate website for a remote Admissions position, seeking a role compatible with her ongoing health limitations. The following day, September 3, 2024, Plaintiff emailed Lorenzo Rivera to notify him of the application and to express her continued interest in employment despite being unwell. She emphasized her need to work and requested consideration for the position. No response was received. This silence, in contrast to Plaintiff's proactive outreach and transparency, reflects a disregard for her attempt to remain engaged in the workforce while navigating medical hardship.

On September 12, 2024, Plaintiff emailed Lorenzo Rivera once again, summarizing the series of events she had endured and reaffirming her desire to return to work. Plaintiff explained that the way her insurance had been canceled—retroactively and without proper notice—left her unable to secure new coverage. Under standard insurance enrollment rules, individuals typically have a 60-day window to obtain new insurance following termination of coverage. Because Plaintiff was not informed in time and her cancellation had been backdated to December 31, 2023, she missed the eligibility window and was effectively locked out of coverage from the outset. This administrative failure compounded Plaintiff's financial and medical hardship and further obstructed her ability to stabilize her health and employment.

8